711 A.2d 961 (1998)
312 N.J. Super. 353
WILLIAM G. MULLIGAN FOUNDATION FOR THE CONTROL OF FIRST AID SQUADDERS AND ROVING PARAMEDICS, a New Jersey Nonprofit Corporation, Plaintiff-Appellant,
v.
Thomas S. BROOKS, Kevin M. Hahn, Sharon L. Freeman, William Herpich, Edward Niedzinski, Scott M. Minter, Louis P. Bona, Art Hornung, and Frank J. Vanore, Individually and as Trustees on the Board of Trustees of the Panther Valley Property Owners Association, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1998.
Decided June 25, 1998.
Frank Askin, Newark, for plaintiff-appellant (Mulligan & Mulligan, Hackettstown, attorneys; Mr. Askin, Special Counsel and on the briefs).
Marilyn S. Silvia, Princeton, for defendants-respondents (Hill Wallack, attorneys; Ms. Silvia, on the brief).
Before Judges STERN, KLEINER and KIMMELMAN.
The opinion of the court was delivered by
STERN, J.A.D.
Plaintiff appeals from the grant of summary judgment dismissing its complaint seeking to compel defendants, the trustees of the Panther Valley Property Owners Association (PVPOA), to publish plaintiff's advertisement in defendants' newsletter, The Panther. Plaintiff claims that defendants violated its right of free speech guaranteed under the New Jersey Constitution by refusing to accept its advertisement for publication. Plaintiff also claims that defendant owed plaintiff's founder and trustee, Elinor Mulligan, a fiduciary duty to publish the advertisement.

I.
The essential facts are not in dispute. Because of the nature of defendants' summary judgment motion,[1] plaintiff is entitled to "all the favorable inferences," Brill v. Guardian *962 Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995), and we adopt for present purposes its version of the facts:
Panther Valley is a private, gated community of some 1,200 individual households and a population of some 4,000 persons. It covers approximately 1,500 acres in Allamuchy Township in Warren County. All Panther Valley property owners are members of the Panther Valley Property Owners Association (PVPOA), which is governed by a 9-member Board of Trustees elected by the members.
For many years, the PVPOA has published a monthly newsletter called The Panther, which identifies itself as "The Official Communication Medium of the Panther Valley Community." The Panther "serves as a community bulletin board and is mailed free of charge to Panther Valley residents," and has no other distribution. Since PVPOA rules and regulations forbid "soliciting of any kind within Panther Valley", The Panther is the only effective means of communication among all residents of the community.
The only written guidelines governing publication of materials in The Panther are guidelines for letters to "The Mailbox", instituted in mid-1996, which are actually "letters to the editors". Those letters are subject to numerous restrictions including no more than 250 words; they must be signed using full name, address and phone number; the Communications Committee will select letters for publication; and selection will be based upon "relevance, timeliness and constructiveness."

The Panther accepts paid advertising and has a rate chart for such ads. There are no regulations or guidelines governing the content of advertising. Publication of The Panther is supervised by an editor and Communications Committee appointed by and answerable to the Board of Trustees, with the assistance of a professional staff member employed by the PVPOA.
Elinor Mulligan is a resident of Panther Valley, and has been since 1972, and is a member in good standing of the PVPOA. She happens to be an attorney, and her law firm regularly advertises in The Panther. Ms. Mulligan is also the founder and incorporator of the William G. Mulligan Foundation for the Control of First Aid Squadders and Roving Paramedics (Plaintiff and hereinafter "Mulligan Foundation") of which she serves as one of the three trustees. The Foundation was organized for certain stated purposes including the promotion and advancement of public knowledge of the rights and privileges granted by law to volunteer first aid and rescue squads and their members and to salaried paramedics. As a consequence of an unfortunate incident in 1991 following the death of Ms. Mulligan's husband, Ms. Mulligan had filed suit against the Allamuchy-Green First Aid Squad (hereinafter "AGFAS") and the paramedics the squad called to Ms. Mulligan's home at that time. The lawsuit was an effort to clarify the legal rights and obligations of such persons. The case was entitled Mulligan v. Allamuchy-Green First Aid Squad, et al. The summary judgment granted all defendants by the Superior Court confirming the extensive immunity of first aid squads and their members under New Jersey law was then affirmed by the Appellate Division in an unreported opinion (App.Div.A-6801-94T1) and certification was denied.

The Panther regularly prints materials favorable to the AGFAS urging PVPOA members to join and contribute to the squad and to call upon it for services. And, the June 1996 issue of The Panther contained an article under the heading "Good Judgment" which favorably reported that the dismissal of Ms. Mulligan's suit against the AGFAS had been upheld by the Appellate Division. All of these materials including the aforedescribed article were printed in The Panther without any charge to AGFAS.
On January 15, 1997, on behalf of the Mulligan Foundation, Ms. Mulligan submitted an advertisement to be placed in the February issue of The Panther explaining the legal rights and privileges of first aid squads such as the AGFAS and of salaried paramedics which had been confirmed by the state courts as a result of the Mulligan case. The submission used the same "True-False" format of some of *963 the AGFAS published submissions and was accompanied by a check in full payment for the ad.
By telephone on January 17, confirmed by a letter dated January 17 from defendant Scott Minter, as chairman of the PVPOA Communications Committee, Ms. Mulligan was informed that her ad had been rejected for publication. The ground[s] stated for rejection was that "it appears to be more of an editorial than an advertisement." A subsequent letter dated February 10, also signed by Mr. Minter, stated that "it would be more appropriate to print your copy in the `Mailbox' column as an editorial piece," but went on to say that such a submission would have to be substantially edited to eliminate certain "negative comments". Mr. Minter further advised Ms. Mulligan that any submission to the "Mailbox" would have to be of a "constructive nature" which he explained meant "it does not contain negative or pejorative statements or allusions about individuals, provides suggested solutions for perceived problems, etc." Ms. Hauschild later explained that it was her opinion that the proposed advertisement was "unpleasant and inappropriate", but conceded that was an ad hoc determination unguided by any rules or guidelines of the PVPOA or the newsletter.
This suit followed, seeking an Order prohibiting defendants PVPOA Trustees from refusing publication of Plaintiff's ad in The Panther. (Citations omitted.)
Defendants dispute only plaintiff's claim that its ad was "rejected" and that defendants acted in an "arbitrary" manner. Defendants insist they "agreed to publish Mrs. Mulligan's `opinions' about the Rescue Squad" and "asked only that the `ad' comply with guidelines adopted for editorial comment and delete references which would identify specific individuals due to the notoriety generated by the prior litigation between Mrs. Mulligan and the Rescue Squad."

II.
Plaintiff argues that defendants violated the free speech provision of the New Jersey Constitution by refusing to accept the advertisement for publication. It claims that the action of the trustees impermissibly turned Panther Valley into a "political isolation booth," in which only one side of a public issue could be heard. Defendants claim that as a private entity that has not invited any public participation, it does not have to allow plaintiff to speak on its property.
In his decision, the motion judge noted that the First Amendment does not "protect rights of speech and assembly against interference or impairment by private individuals." He said that the amendment "poses no limitations upon the owner of private property used nondiscriminatorily for private purpose only, even though such use may trench upon the speech and assembly activities of other persons." The judge performed an analysis under the test set forth in State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980), appeal dismissed, sub nom. Princeton Univ. v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L. Ed.2d 855 (1982), and concluded under the New Jersey Constitution that the PVPOA "in publishing the Panther has a right to refuse to publish ads that it feels are not advertisements but are more editorial in content than advertisements."
Before us, plaintiff concedes "that if the First Amendment's definition of press is broad enough to encompass such a private community association's newsletter, defendants' federal rights are superior to plaintiffs' rights under the New Jersey Constitution." Stated differently, plaintiff concedes that if The Panther is "the press," plaintiff cannot prevail given the First Amendment protections enjoyed by "the press." However, plaintiff claims that the publishers and editors of The Panther do not constitute "the press" in the constitutional sense, but rather are merely "fiduciaries with an obligation to manage a community resource." Plaintiff therefore insists that the New Jersey Constitution requires that defendants publish its submission. Defendants point out that N.J. Const. art. I, ¶ 6, also guarantees freedom of "the press" and claim, without citation, that "neither the United States nor the New Jersey Constitution has been construed to limit First Amendment protections to the *964 `press' as defined by implication by the plaintiff."
We will assume, as do the parties before us, that plaintiff is correct and that this case, involving a private homeowner association monthly newsletter to its residents, does not involve freedom of the "press," as that term is used in either the First Amendment to the federal Constitution or N.J. Const. art. I, ¶ 6.[2] As such, we conclude that defendants are protected under the State Constitution which guarantees the right to acquire, possess and protect private property. N.J. Const. art. I, ¶ 1; see also N.J. Const. art. I, ¶ 20.[3]
Art. I, ¶ 6, of our State Constitution provides that:
Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.
N.J. Const., art. I, ¶ 18, also guarantees the right of assembly. As a result, our Supreme Court has concluded that
the State Constitution furnishes to individuals the complementary freedoms of speech and assembly and protects the reasonable exercise of those rights. These guarantees extend directly to governmental entities as well as to persons exercising governmental powers. They are also available against unreasonably restrictive or oppressive conduct on the part of private entities that have otherwise assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property.

[State v. Schmid, 84 N.J. at 560, 423 A.2d 615 (1980) (emphasis added).]
In Schmid, the Court held that Princeton University, though a private institution, could not evict defendant or prosecute him as a trespasser while he was endeavoring to distribute political literature on campus.[4] In so holding, the Court recognized the need to "achieve the optimal balance between the protections to be accorded private property and those to be given to expressional freedoms exercised upon such property." Id. at 562, 423 A.2d 615. In balancing the rights of speech and assembly upon private property and the extent to which such property owners can reasonably restrict those rights, the Court adopted a three-part test which requires consideration of 1) the nature, purpose, and primary use of such private property, 2) the extent and nature of the public's invitation to use that property, and 3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property. Id. at 563, 423 A.2d 615. Even when an owner of private property is constitutionally obligated to honor speech and assembly rights of others, the owner is entitled to fashion reasonable rules and regulations to control the time, mode, opportunity and site for the individual exercise of expressional rights on the property. Ibid. In this regard, consideration must also be given to whether there exists convenient and feasible alternative means to individuals to engage in substantially the same expressional activity. Ibid.
In Bellemead Dev. Corp. v. Schneider, 196 N.J.Super. 571, 574, 483 A.2d 830 (App. Div.1984), certif. denied, 101 N.J. 210, 501 A.2d 894 (1985), we stated that the Schmid framework of analysis requires "an initial determination of whether the owner has devoted [the] property to some public use." In Bellemead, the owner of five office buildings *965 in the Meadowlands Corporate Center was not compelled "to admit a union organizer on [its] properties to distribute leaflets to office workers at building entrances adjacent to employee parking lots." We held that because plaintiffs had not devoted their property to any public use, the three-part Schmid test need not be considered. Id. at 575, 423 A.2d 615.
In State v. Brown, 212 N.J.Super. 61, 62, 513 A.2d 974 (App.Div.), certif. denied, 107 N.J. 53, 526 A.2d 140 (1986), anti-abortion demonstrators picketed a private health-care facility located in an office complex. The plaintiff was convicted of criminal trespass for picketing on the premises, and we affirmed the conviction. Id. at 62-63, 513 A.2d 974. We found that "[t]he tenants and their invitees [were at the office complex] by specific invitation" and that the general public was not invited to use, nor used, the property. Id. at 65, 513 A.2d 974. Based on those facts, we determined that the premises were not devoted to a "public use as that term is used in the freedom of expression cases." Id. at 66, 513 A.2d 974. We, therefore, held that an analysis of the three Schmid factors was not necessary, but added that if the analysis were undertaken, the office complex would not be considered public because it was "not the functional equivalent of a suburban shopping center nor a place to which a general consumer would go to shop for personal, household or general business merchandise." Ibid. at 66, 513 A.2d 974. It had no common area, and no places that contemplated the congregation of people or the dissemination of literature. Ibid. In affirming the conviction, we also found that "[t]he second of the Schmid factors, the extent and nature of the invitation of the public, also disfavors defendant." Ibid.
In New Jersey Coalition Against War in the Middle East v. J.M.B., 138 N.J. 326, 650 A.2d 757, (1994), cert. denied, 516 U.S. 812, 116 S.Ct. 62, 133 L. Ed.2d 25 (1995), a citizens group sued the owners of private shopping malls to compel the owners to grant access to the private properties to allow the group to engage in leafletting. Under the Schmid test, the Court found a constitutional obligation to permit the leafletting by plaintiffs at certain regional and community shopping centers. Id. at 334, 650 A.2d 757. Speaking through Chief Justice Wilentz, the majority concluded that:
Although the ultimate purpose of these shopping centers is commercial, their normal use is all-embracing, almost without limit, projecting a community image, serving as their own communities, encompassing practically all aspects of a downtown business district, including expressive uses and community events. We know of no private property that more closely resembles public property. The public's invitation to use the propertythe second factor of the [Schmid] standardis correspondingly broad, its all-inclusive scope suggested by the very few restrictions on the invitation that are claimed, but not advertized, by defendants....
As for the third factor of the standard the relationship between the purposes of the expressional activity and the use of the propertythe free speech sought to be exercised, plaintiff's leafletting, is wholly consonant with the use of these properties.

[Id. at 333-34, 650 A.2d 757.]
In Guttenberg Taxpayers and Rentpayers Ass'n. v. Galaxy Towers, 296 N.J.Super. 101, 102, 686 A.2d 344 (App.Div.1995), a political association sought an injunction to prohibit a condominium association from preventing it from distributing pamphlets on the condominium association's property during a school board election. Galaxy Towers was a private, residential property of 1,075 condominium units located in three high-rise buildings with related common elements such as hallways, elevators, lobbies and a parking garage. Id. at 103, 686 A.2d 344. The lobby and the garage were guarded by security personnel. Ibid. Within the complex, there was a shopping center known as the Galaxy Mall, which was owned by a third party. Ibid. The mall was open to the public and contained entrances to the Galaxy Towers. Ibid. However, the public "[was] never invited into or permitted to enter Galaxy Towers without permission." Ibid. No "canvassing or solicitation," either by residents or outsiders, was permitted. Ibid. The polling place for the residents of Galaxy Towers was in *966 the Galaxy Mall. Ibid. However, the condominium association did, in its regular newsletter and in special notices and bulletins, endorse candidates for local elective office. Id. at 104, 686 A.2d 344. We held that the Schmid test controlled, that "[t]he required balancing of property rights and free speech rights depend[ed] on a discreet consideration of the facts concerning the use of the property, as well as the practices of the condominium association with regard to its endorsement of political candidates and issues, and other activities deemed pertinent" and remanded for "a plenary hearing." Id. at 108, 686 A.2d 344.
On remand, the trial judge noted that to permit "public access" there had to be "an initial determination that there is some type of public dedication of the property." Guttenberg Taxpayers and Rentpayers Ass'n, 297 N.J.Super. 404, 409, 688 A.2d 156 (Ch. Div.1996), aff'd, 297 N.J.Super. 309, 688 A.2d 108 (App.Div.1996), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997). The judge found that Galaxy was "routinely used for political campaigning," distribution of "political leaflets and handbills [were] part of the normal, everyday activities that occur on the property," and that the residents "expect[ed] as a matter of course" that election materials would be "placed under their doors." Id. at 409, 688 A.2d 156. The judge also found that because the condominium had become essentially a "`company town' ... in which political access controlled by the Association [was] the only `game in town,' ... [d]istribution of plaintiffs' literature in essentially the same manner in which the Association's literature is distributed [was] the only effective way plaintiffs [could] be guaranteed equal access to the registered voters in Galaxy." Id. at 411, 688 A.2d 156.
Plaintiff argues that its claim is even stronger than that of the plaintiffs in Galaxy because Ms. Mulligan, unlike the plaintiffs in Galaxy, was a member of the community with which she desired to communicate. However, the William G. Mulligan Foundation, not Elinor Mulligan, is the plaintiff seeking to place the advertisement, and its position ignores the three prong test developed in Schmid and the fact that defendants have not dedicated any part of their property to some public use. Although The Panther accepts advertising from local businesses, that invitation to the community does not constitute public use of the premises similar to that in which our courts have upheld the right of free speech on private property. Unlike Princeton University, the Galaxy Mall, or any other shopping center, the public is not permitted on any part of defendants' property. To the contrary, it is a gated community with access only by invitation.
In J.M.B., supra, the Supreme Court reiterated that:
In Schmid [supra, 84 N.J. 535, 423 A.2d 615,] we ruled that our State Constitution conferred on our citizens an affirmative right of free speech that was protected not only from governmental restraintthe extent of First Amendment protectionbut from the restraint of private property owners as well. We noted that those state constitutional protections are "available against unreasonably restrictive or oppressive conduct on the part of private entities that have otherwise assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property." [84 N.J. at 560, 423 A.2d 615.] And we set forth the standard to determine what public use will give rise to that constitutional obligation. The standard takes into account the normal use of the property, the extent and nature of the public's invitation to use it, and the purpose of the expressional activity in relation to both its private and public use. This "multi-faceted" standard determines whether private property owners "may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly." Id. at 563, 423 A.2d 615. That is to say, they determine whether, taken together, the normal uses of the property, the extent of the public's invitation, and the purpose of free speech in relation to the property's use result in a suitability for free speech on the property that on balance, is sufficiently compelling to warrant limiting the private property owner's right to exclude *967 it; a suitability so compelling as to be constitutionally required.

[New Jersey Coalition v. J.M.B., supra, 138 N.J. at 333, 650 A.2d 757.]
Without considering the reasonableness of the restrictions or limitation defendants placed on plaintiff's "advertisement," we conclude that the normal uses of the property, the absence of invitation for public use, and the type of the speech involved here do not compel us to limit defendants' rights as owners of private property.[5]

III.
In so holding, we recognize another fundamental difference plaintiff tries to develop in order to distinguish this case from the controlling precedent. Plaintiff claims that because Ms. Mulligan is a member of defendants' private association, she has a state constitutional right to exercise her right of free speech in the newsletter of the association of which she is a member, and, independently, that defendants breached a fiduciary duty they owed to her. But, as the trial judge noted, plaintiff is not a member of the Association, and Ms. Mulligan is not the plaintiff. Moreover, plaintiff does not challenge the denial of its belated endeavor to add her as a plaintiff after summary judgment was entered. In any event, while the motion judge referred to Ms. Mulligan as an Association member in his opinion and later indicated that the result would not have been "any differen[t]" had Ms. Mulligan been added as a plaintiff, the record does not adequately develop the rights and obligations of membership in the Association and the relationship between the Association members and trustees.[6] Accordingly, we find it both unnecessary and unwise to decide the interesting and difficult question raised before us concerning Ms. Mulligan's individual right to compel publication of the advertisement or, perhaps more appropriately, a statement submitted by her personally.

IV.
The judgment is affirmed.
NOTES
[1] Plaintiff does not contend that the matter was inappropriately considered on motion for summary judgment. See R. 4:6-2; R. 4:46.
[2] In the absence of briefing, we do not consider the issue. But see, e.g., Branzburg v. Hayes, 408 U.S. 665, 704-05, 92 S.Ct. 2646, 2668-69, 33 L. Ed.2d 626, 653 (1972); Lovell v. City of Griffin, Ga., 303 U.S. 444, 450-52, 58 S.Ct. 666, 668-69, 82 L. Ed. 949, 952-54 (1938).
[3] There is no dispute that the federal constitution gives no general right of free speech on private property. See New Jersey Coalition Against War in the Middle East v. J.M.B., 138 N.J. 326, 349, 650 A.2d 757 (1994), certif. denied, 516 U.S. 812, 116 S.Ct. 62, 133 L. Ed.2d 25 (1995). Plaintiff, therefore, does not challenge that part of Judge Harry Seybolt's comprehensive opinion dealing with the federal constitution. We also agree with his conclusion under the State Constitution.
[4] Princeton did not have reasonable regulations governing such conduct in place at the time. Id. at 568-69, 423 A.2d 615.
[5] As a result, we need not consider the impact of the fact that plaintiff's claim would require defendants to do something at a costprint the advertisementeven though plaintiff is willing to offset the costs thereof.
[6] Defendants attached the PVOA bylaws to a certification in the record, but there was no consideration of the "rights of membership" or the nature and obligations of the Association, its Board of Trustees, Committees or officers other than the context of the plaintiff's constitutional rights. The trial court proceedings focused on the constitutional argument, and while plaintiff suggests before us that Ms. Mulligan's membership in defendant Association affects the balance under Schmid, plaintiff did not argue in the trial court (nor really argues before us) that the corporate charter or any specific bylaw has been violated.