890 A.2d 947 (2006)
383 N.J. Super. 22
COMMITTEE FOR A BETTER TWIN RIVERS, Dianne McCarthy, Haim Bar-Akiva and Bruce Fritzges, Plaintiffs-Appellants/Cross-Respondents,
v.
TWIN RIVERS HOMEOWNERS' ASSOCIATION, Twin Rivers Community Trust, and Scott Pohl, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 2005.
Decided February 7, 2006.
*950 Frank Askin argued the cause for appellants/cross-respondents (Rutgers Constitutional Litigation Clinic, attorneys; Mr. Askin, on the brief).
Barry S. Goodman, Woodbridge, argued the cause for respondents/cross-appellants Twin Rivers Homeowners' Association and Twin Rivers Community Trust (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, and Kennedy, Wronko, Kennedy, attorneys; Mr. Goodman with Karyn A. Kennedy Branco, of counsel and on the brief; Jane Felton and David S. Schechter, on the brief).
Michael S. Karpoff, Princeton, argued the cause for respondent/cross-appellant Pohl (Hill Wallack, attorneys; Mr. Karpoff, on the brief).
Hueston, McNulty, Mueller & DeGonge; Pepper Hamilton; and Nowell Amoroso Klein & Bierman, attorneys for amicus curiae Community Associations Institute (Samuel J. McNulty and Dennis R. Casale, of counsel and on the brief; Audrey D. *951 Wisotsky and Thomas Martin, on the brief).
Before Judges KESTIN, LEFELT[1] and FUENTES.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
In this appeal, among other issues, we address the questions whether, and in what circumstances, the expressive rights guarantees of the New Jersey Constitution limit the authority of those who govern a community association in setting and administering standards for that community; the extent to which the Planned Real Estate Development Full Disclosure Act applies to a community established before the statute was enacted; and questions bearing upon the application of the business judgment rule and contractual standards.
Plaintiff Committee for a Better Twin Rivers (CBTR) is a non-profit, unincorporated association comprised of residents of Twin Rivers, a planned unit development in East Windsor. The individual plaintiffs, Dianne McCarthy, Haim Bar-Akiva, and Bruce Fritzges are residents of Twin Rivers. McCarthy and Bar-Akiva are members of CBTR. The defendants are the Twin Rivers Homeowners' Association (TRHA), the Twin Rivers Community Trust (TRCT), and Scott Pohl, the president of TRHA and a member of TRHA's board of trustees.
Plaintiffs sued for declaratory and injunctive relief in a nine-count complaint. Count one of the amended complaint sought mandatory injunctive relief permitting "the posting of political signs" on the property of community residents "and on common elements under reasonable regulation." Count two sought mandatory injunctions "to allow plaintiffs to utilize the community room in the same manner as other similarly situated entities." In the third count, plaintiffs sought "equal access" to the pages of Twin Rivers Today (TRT), "the official newspaper of Twin Rivers .... published and distributed monthly to each resident by the TRHA"[;] mandatory injunctive relief that would permit the "expression of their views [therein] concerning the management of the community[;]" and an injunction against "the president of [TRHA] from using TRT as his own personal political trumpet[.]" In counts four and five respectively, plaintiffs sought the right to tape record TRHA board meetings and to have access to TRHA financial records. In count six, plaintiffs sought declaratory rulings establishing the invalidity of a TRHA board resolution that provided for the discipline of board members suspected of disclosing information deemed confidential, and determining that plaintiff McCarthy had not violated the resolution; along with an expungement of McCarthy's censure in TRHA records. In count seven, plaintiffs sought "access to lists of eligible voters [in TRHA elections] without unreasonable conditions." Count eight sought an improved alternate dispute resolution mechanism over that in established TRHA procedures, as well as mandatory injunctive relief "re-establishing the voting rights of plaintiff Bruce Fritzges and other TRHA members similarly situated." In count nine, plaintiffs sought a declaratory judgment that the then-current weighted-voting provisions of TRHA's charter and bylaws violated the New Jersey Constitution, requiring reformation. Plaintiffs also sought counsel fees and costs.
*952 The parties filed cross-motions for summary judgment. The motion judge granted summary judgment in favor of plaintiffs on certain elements of counts two and seven and on count six; and in favor of defendants on other elements of counts two and seven, and on counts one, three, five, eight, and nine.[2] The court's order also memorialized rulings on "three overarching issues":
that TRHA is not subject to the constitutional limitations imposed on state actors, at least in the factual context specifically presented in this case; that the 1993 amendments to PREDFDA [the Planned Real Estate Development Full Disclosure Act], as codified in N.J.S.A. 45:22A-43 to -48, apply to Twin Rivers; and that Plaintiff CBTR is dismissed from the case for lack of standing.
The reasons for the court's summary judgment determinations and rulings were expressed in a comprehensive written opinion appended to the order.

I
Plaintiffs appeal from the disposition as to counts one, two (in part), three, five, eight, and nine. They challenge the "overarching" ruling regarding constitutional limitations, specifically contending that the motion judge erred in upholding defendants' policies restricting signs on residents' lawns, charging assertedly excessive fees for use of the community room, refusing to afford equal coverage to plaintiffs' views in the Twin Rivers Today newsletter, withholding access to financial documents, disenfranchising plaintiff Fritzges for refusing to pay a fee and failing to provide alternative dispute resolution for his dispute, and weighting TRHA voting according to property value. Plaintiffs also challenge the judge's holding that CBTR did not have standing.
Defendants appeal from the disposition of counts two (in part), six and seven (in part). They challenge the judge's "overarching" ruling that PREDFDA applies to Twin Rivers. Defendants also contend specifically that the judge erred in invalidating existing TRHA standards governing use of the community room as "impermissibly vague .... and direct[ing] that the regulations for the use of the room be modified to provide clear standards for the granting or withholding of permission for its use;" disallowing certain TRHA standards regarding the confidentiality of documents; and invalidating a liquidated damages provision for violation of the confidentiality agreement required before a member may obtain TRHA's voting list.
Plaintiffs depict this appeal as squarely presenting the one question "left unanswered... in Mulligan v. Panther Valley Property Owners Ass'n, 337 N.J.Super. 293, 766 A.2d 1186 (App.Div.2001), because of an insufficient record: i.e., whether defendant association `performed quasi-municipal functions, such that its actions perhaps should be viewed as analogous to governmental actions in some regards.'" Id. at 305, 766 A.2d 1186. Plaintiffs assert that "[t]he record in this case fills the gap that existed in the Panther Valley record, and demonstrates that Twin Rivers operates as a constitutional actor." Defendants join issue, contending that the conduct involved is that of private actors not subject to constitutional control, and must be evaluated under the business judgment rule and an analysis of contractual rights. Amicus curiae, Community Associations Institute, has filed a brief in support of defendants' positions.

*953 II
The motion judge, in his opinion, set out the factual background of the matter:
Twin Rivers is a planned unit development ("PUD") consisting of privately-owned condominium duplexes, town-houses, single family homes, apartments and commercial buildings located in the Township of East Windsor, New Jersey. The community covers about one square mile in area and contains a population of approximately 10,000 people occupying some 2,700 residences. The Twin Rivers Community Trust ("TRCT" or "Trust") was created by Indenture on November 13, 1969 for the stated purpose of owning, managing, operating and maintaining the residential common property of Twin Rivers. Each property owner is assessed a fee to fund the managerial and operational expenses of the Trust.
Twin Rivers Homeowners Association ("TRHA" or "Association") has sole discretion, under the indenture, to make reasonable rules and regulations for the conduct of its members upon the land owned or controlled by the Trust. All property owners in Twin Rivers are automatically members of the Association and beneficiaries of the Trust. Purchasers are required, as a condition of purchase, to accept the regulations of the TRHA Articles of Incorporation and its By-Laws. Violations of the rules are punishable by fines, which can range in amount from $50 to $500. The Association is governed by a Board of Directors ("Board"), whose members are elected by all eligible voting members of the Association. The Board serves as trustee for TRCT. All members of the Association who are in "good standing" at the time of the elections are eligible to vote for nominees to the Board.
Twin Rivers provides various amenities for the exclusive use of its residents, including parks, four pool complexes, handball and basketball courts, ball fields, and playgrounds. Twin Rivers also offers certain services to its residents, including lawn maintenance, recycling, garbage collection for certain sections of the community, snow removal, and street lighting. Located within the "boundaries" of Twin Rivers are various private commercial businesses such as dry cleaners, gas stations and banks. Several public facilities are also located within the borders of Twin Rivers, including schools, a county library and a firehouse. These public facilities are provided and maintained by the Township of East Windsor. In addition to the 34 private roads in Twin Rivers, a state highway also runs through the community.
In addition to the foregoing, TRHA sponsors recreational and sports activities, trips, events, and a day camp.
Twin Rivers is not a gated community. Its roads are open to public traffic. The TRCT administrator certified, however, that "[t]rust-owned property and facilities are for the exclusive use of Twin Rivers residents and their invited guests," and that the "general public is not invited" to use them.
TRHA expected to collect over $3,000,000 from homeowners' maintenance fees in 2001, and its annual budget was nearly $3,500,000. It had over twenty year-round employees and fifty who worked on a seasonal basis.
In a document before the trial court on the motions for summary judgment, the TRCT administrator listed services that the Township of East Windsor provides to Twin Rivers's residents. Those services include police, firefighting, first aid, road and traffic control, public education, health *954 and welfare provisions, water and sewage systems, and zoning and building codes.
Plaintiffs' expert, Evan McKenzie, an associate professor of political science at the University of Illinois and an attorney, certified that Twin Rivers's centralized shopping area, "looks and feels like a town," and that TRHA delivered "a broad range of traditional municipal services" to its residents. He opined that "privately governed communities in this country," including Twin Rivers, "have substantially replaced municipal government as the most immediate form of government for their residents" and "exercise government-like dominion over their residents without formal accountability to the public political process."
Arlene Mulry-Pearl, a real estate broker dealing in Twin Rivers properties for twenty-six years, a resident of Twin Rivers for over twenty-four years, and the owner of a townhouse there, opined that it was a desirable community, clean and well-maintained, with attractive recreational facilities. She attributed the steadily increasing home values in Twin Rivers to TRHA's rules and regulations, which insured that needed repairs were done and "maintain[ed] the beauty and integrity of the community." She noted that the Twin Rivers "monthly maintenance fee is quite reasonable and a good value" compared to fees charged in other developments in the area.
The motion judge, in his opinion, described the plaintiffs as follows:
The individual Plaintiffs are residents of Twin Rivers and members of the Association. Dianne McCarthy was also a member of the Board of Directors, (although now a former member). All of the Plaintiffs, with the exception of Bruce Fritzges, are also members of an unincorporated association known as The Committee for a Better Twin Rivers ("CBTR"). CBTR was organized for the stated purpose of focusing the efforts of Twin Rivers residents interested in changing the manner in which Twin Rivers is administered. It does not have any formal membership requirements, but it is recognized throughout the community, and its activities are regularly reported and commented upon in the community newspaper, Twin Rivers Today ("TRT").
In framing the questions to be addressed, the motion judge noted the presentation of the "three overarching issues," which he characterized as follows: "whether Twin Rivers has `quasi-municipal' status, the applicability of PREDFDA, and whether CBTR has standing to appear as a plaintiff in this case." These issues are before us on appeal, as well. As we have noted, the judge decided the first and third adversely to plaintiffs and the second adversely to defendants. We will review and pass upon the motion judge's disposition of those three issues before addressing any of the particular questions he decided.

III
We disagree with the trial court's determination that TRHA is not subject to constitutional limitations such as those imposed on public sector actors. The basis for the trial court's ruling was that no governmental entity had delegated governmental powers to TRHA, and that TRHA performed no inherently governmental functions. In arriving at our conclusion that this ruling was erroneous, we eschew the use of the term "quasi-municipal" because, in the context of the issues before us, it tends to beg the question and adds nothing to the necessary inquiries. We are called upon to determine whether the standard-setting and standard-applying exercises at issue are essentially in performance of public functions or impact with *955 sufficient directness upon public interests to call into play the constitutional limitations that classically apply to public sector actors, but which the New Jersey Constitution applies more broadly.

A.
The motion judge cogently summarized the positions of the parties on this status issue as follows:
Plaintiffs claim that TRHA has substantially replaced the role of the municipality in the lives of its ten thousand residents, by providing various services that are traditionally performed by municipal bodies, and should therefore be subject to the same constitutional limitations as a municipality in creating "laws" for the community. The Board of the Association functions as a municipal council, and the mandatory assessments levied on owners are, they argue, the equivalent of a tax. Therefore, Plaintiffs argue, TRHA should be required to respect the same constitutional boundaries that would be required of a municipality. Plaintiffs further argue that the provisions of the Condominium Act at N.J.S.A. 46:8B-15(f) which allow for an Association to impose fines as penalties for violation of its rules are a delegation of police powers which are unique to the government, and therefore, the Association takes on "quasi-municipal" status, in part, because of this ability to impose fines. Defendants reject the assertion that Twin Rivers is equivalent to a municipality, and that the Constitution applies to TRHA in the same way it applies to state actors. TRHA and the Trust are non-profit organizations, and Defendants claim that it is well settled law in New Jersey that the business judgment rule is the standard of review for the duly enacted policies and decisions of their board of trustees. Defendants argue that the burden is on Plaintiffs to show that the decisions of the Board were fraudulent, self-dealing or unconscionable; which Defendants assert they cannot and do not do in their pleadings.

B.
Nationally, as of 1999, 42,000,000 Americans lived in community associations. Clifford J. Treese, Community Associations Factbook 6 (Frank H. Spink ed., 1999).
In a paper presented at a governmental services conference in 2002, Edward Hannaman, the association regulator in the Planned Real Estate Development Unit, Bureau of Homeowner Protection, Division of Codes and Standards of the Department of Community Affairs, noted that, in New Jersey, 40% of private residences and over 1,000,000 people were governed by homeowners' associations. According to him, almost 20% of "new homebuyers" were required to join community associations in 1996, and the number increased to over 30% in 2000. According to the Mercer County multiple listing service, 23% of real estate listings for homes in that county in 2002 required membership in condominium or homeowners' associations.
Hannaman said that complaints revealed an "undemocratic life" in many associations, with homeowners unable to obtain the attention of their board or manager. Boards "acting contrary to law, their governing documents or to fundamental democratic principles, are unstoppable without extreme owner effort and often costly litigation." Board members "dispute compliance" with their legal obligations and use their powers to punish owners with opposing views. "The complete absence of even minimally required standards, training or even orientation for those sitting on boards and the lack of independent oversight is *956 readily apparent in the way boards exercise control."
Hannaman described instances of abuse of power in some detail while conceding that there were "many good associations." He stressed, however that, typically, power was centralized in boards, which acted as executive, legislature and judiciary.
An Assembly Task Force to Study Homeowners' Associations, created by Assembly Resolution No. 47 of 1996, reported in 1998 that associations' duties were "increasingly governmental" and that they exercised "quasi-governmental powers." The Task Force recommended that associations be subject to several government standards, including public bidding and disclosure of conflicts of interest.
The Task Force reported that "many residents feel that the `balance of power' hangs too heavily in the direction of the association board. The testimony indicated that more should be done to safeguard homeowners' rights of due process, including guidelines for fair elections of board members...." The Task Force recommended oversight of board action by the Commissioner of Community Affairs to protect residents' rights and to ensure against capricious use of board power. The Legislature has not acted on the recommendations of the Task Force.
In contrast, the Community Associations Factbook states: "Community associations are arguably the most representative and responsive form of democracy found in America today. Residents of a community freely elect neighbors to serve on a board of directors of that community." Treese, supra, at 9.

C.
Plaintiffs assert that, just as shopping centers that are technically private have replaced downtown business districts, planned developments that are technically private have replaced towns. Plaintiffs argue that fundamental constitutional rights must be protected despite these changes in the environment in which they are exercised. They contend that their status as residents of a private community, rather than visitors to private property, strengthens their position.
Defendants counter that the judge properly applied the business judgment rule as the basic criterion governing their conduct. They contend that constitutional standards apply to private actors only when they invite the public onto their property, and that plaintiffs are members of the TRHA, not the invited public. Defendants assert that "[a]pplying the Constitution as a whole would fundamentally alter the very nature of planned developments."
The argument in favor of the application of constitutional standards has its roots in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). There, appellant was convicted of trespassing for distributing religious literature in Chickasaw, a "company-owned town[,]" which was otherwise open to the public. 326 U.S. at 502, 66 S.Ct. at 277, 90 L.Ed. at 266. Invalidating the application of the state trespassing statute in the circumstances at hand, the Court held that "those people who live in or come to Chickasaw [cannot] be denied freedom of press and religion simply because a single company has legal title to all the town[.]" 326 U.S. at 505, 66 S.Ct. at 278, 90 L.Ed. at 268.
The Court balanced "the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion," noting that "the latter occupy a preferred position." 326 U.S. at 509, 66 S.Ct. at 280, 90 L.Ed. at 270. The Court explained: "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his *957 property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." 326 U.S. at 506, 66 S.Ct. at 278, 90 L.Ed. at 268.
The Court held that people who live in company-owned towns, like residents of municipalities, "are free citizens of their State and country," and that "[t]here is no more reason for depriving these people of the liberties guaranteed by the First and Fourteenth Amendments than there is for curtailing these freedoms with respect to any other citizen." 326 U.S. at 508-09, 66 S.Ct. at 280, 90 L.Ed. at 270.
In State v. Schmid, 84 N.J. 535, 538, 423 A.2d 615 (1980), appeal dismissed, sub nom. Princeton University v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), defendant was convicted of trespassing for distributing political literature on the campus of Princeton University. The Supreme Court of New Jersey declined to rule on the basis of the First Amendment to the United States Constitution, recognizing that the New Jersey Constitution was an "independent source of individual rights[,]" id. at 555, 423 A.2d 615, which could "surpass the guarantees of the federal Constitution." Id. at 553, 423 A.2d 615. The Court specifically cited two provisions of the New Jersey Constitution as "more sweeping in scope than the language of the First Amendment[.]" 84 N.J. at 557, 423 A.2d 615.
Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press....
[N.J. Const. (1947) art. I, ¶ 6.]
The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances.
[N.J. Const. (1947), art. I, ¶ 18.]
Noting that the interpretation of the New Jersey Constitution is not subject to "constraints arising out of principles of federalism[,]" id. at 559, 423 A.2d 615, the Court, in an opinion authored by Justice Handler, held that the guarantees the State Constitution confers can be available against private entities, as well as governmental entities, when the private entities have "assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property." Id. at 560, 423 A.2d 615. The Court adopted a balancing test for resolving the conflict between the protections to be accorded private property and those to be given to expressive exercises upon such property:
This standard must take into account (1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property. [Id. at 563, 423 A.2d 615.]
The Court added that private property owners were entitled to impose reasonable rules "governing the time, place and manner for the exercise of such expressional rights." Ibid. Because the University regulations at issue contained no standards, the Court held that the University had violated defendant's "State constitutional rights of expression in evicting him and securing his arrest for distributing political literature upon its campus." Id. at 568, 423 A.2d 615.
In New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326, 650 A.2d 757 (1994), cert. *958 denied sub nom. Short Hills Associates v. New Jersey Coalition, 516 U.S. 812, 116 S.Ct. 62, 133 L.Ed.2d 25 (1995), the Court, in an opinion by Chief Justice Wilentz, confirmed that "the State right of free speech is protected not only from abridgement by government, but also from unreasonably restrictive and oppressive conduct by private entities." Id. at 353, 650 A.2d 757. In that case, the Court applied its ruling in Schmid to large, regional shopping centers. Employing the Schmid balancing test, the Court concluded that "the balance of factors clearly predominates in favor of" the constitutional obligation to allow leafletting at the shopping centers on issues of public import, observing that "the right sought is no more discordant with [the owners'] uses of their property than is the leafletting that has been exercised for centuries within downtown business districts discordant with their use." Id. at 334, 650 A.2d 757.
The Court observed that suburban shopping centers "have substantially displaced the downtown business districts as the centers of commercial and social activity." Id. at 346, 650 A.2d 757.
Although the ultimate purpose of these shopping centers is commercial, their normal use is all-embracing, almost without limit, projecting a community image, serving as their own communities, encompassing practically all aspects of a downtown business district, including expressive uses and community events. We know of no private property that more closely resembles public property.
[Id. at 333, 650 A.2d 757.]
[I]n the process of creating new downtown business districts, [defendants] will have seriously diminished the value of free speech if it can be shut off at these centers. Their commercial success has been striking but with that success goes a constitutional responsibility.
[Id. at 335, 650 A.2d 757.]
The Court emphasized that we have lived with and permitted free speech for over 200 years; "it is constitutionally protected; it is part of this State, and so are these centers." Ibid. The Court concluded that the public use of shopping centers was "so pervasive that its all-embracing invitation to the public necessarily includes the implied invitation for plaintiff's leafletting." Id. at 355, 650 A.2d 757.
The Court said that the first two factors of the Schmid test, "are best considered together, for in this case they are most closely interrelated." Id., at 357, 650 A.2d 757. The Court explained that defendants' private property was transformed "to the mirror image of a downtown business district and beyond that, a replica of the community itself"; and that this "gives rise to an implied invitation of constitutional dimensions that cannot be obliterated by defendants' attempted denial of that invitation." Id. at 360, 650 A.2d 757. The Court thus found that the first two elements of the test, the nature and extent of the public's invitation to use the property, "point strongly in the direction of a constitutional right of free speech." Id. at 361, 650 A.2d 757.
The Court explained that the third element of the Schmid test, the relationship between the purpose of the expressional activity and the private and public use of the property, "examines the compatibility of the free speech sought to be exercised with the uses of the property." Ibid. The Court found that "the more than two hundred years of compatibility between free speech and the downtown business district is proof enough of its compatibility with these shopping centers." Ibid.
Although each of the three Schmid factors supported plaintiffs' right to free *959 speech, the Court in Coalition also based its decision on "the general balancing of expressional rights and private property rights." Id., at 362, 650 A.2d 757. The Court determined that the plaintiffs' leafletting would not have any adverse effect on the defendants' businesses, id. at 361, 650 A.2d 757, and that the defendants had "intentionally transformed their property into a public square or market, a public gathering place, a downtown business district, a community[.]" Id. at 363, 650 A.2d 757. The Court concluded that "[t]he sliding scale cannot slide any farther in the direction of public use and diminished private property interests." Id. at 363, 650 A.2d 757. The Court held that "interference by defendants with plaintiffs' rights constitutes unreasonably restrictive or oppressive conduct." Id. at 365, 650 A.2d 757.
The Court further stressed that "constitutional provisions of this magnitude should be interpreted in light of a changed society," and that the emergence of shopping centers as competitors of and successors to downtown business districts was a significant historical change. Id., at 368, 650 A.2d 757. Emphasizing that the constitutional right to free speech in New Jersey is "an affirmative right" that is "different from practically all others in the nation," and cannot be unreasonably restricted by either government or private entities, id. at 369, 650 A.2d 757, the Court said: "If our State constitutional right of free speech has any substance, it must continue to follow [its] historic path." Id. at 368, 650 A.2d 757. The Court concluded: "We do not believe that those who adopted a constitutional provision granting a right of free speech wanted it to diminish in importance as society changed, to be dependent on the unrelated accidents of economic transformation, or to be silenced because of a new way of doing business." Id. at 370, 650 A.2d 757.
We are mindful that the Court specifically limited its holding to larger, regional shopping centers, id. at 373-74, 650 A.2d 757, and to "leafletting and associated speech" pertaining to "causes, candidates, and partiespolitical and societal free speech." Id. at 374, 650 A.2d 757. The Court allowed these shopping centers "extremely broad" power to regulate "the time, place and manner of exercising the right of free speech." Id. at 377, 650 A.2d 757.
In the face of the New Jersey Constitution's affirmatively framed, imperatively announced, and broadly applicable right to free speech, we conclude, in balancing the interests of the parties, that, in the circumstances presented by this matter, plaintiffs' rights to engage in expressive exercisesincluding those relating to public issues in their own community, such as with regard to the election of candidates to the TRHA Board, or broader issues of governmental and public policy consequence, or matters of general interestmust take precedence over the TRHA's private property interests.
The supremacy of free speech is a significant element of the required balance. Freedom of speech, as a fundamental right, "occupies a preferred position in our system of constitutionally-protected interests." Schmid, supra, 84 N.J. at 558, 423 A.2d 615 (quoting State v. Miller, 83 N.J. 402, 411, 416 A.2d 821 (1980) (invalidating, as violative of the First Amendment, a zoning ordinance prohibiting a sign concerning a matter of public interest on residential property)); Guttenberg Taxpayers and Rentpayers Ass'n v. Galaxy Towers Condominium Ass'n (Galaxy Towers II), 297 N.J.Super. 404, 409, 688 A.2d 156 (Ch.Div.), aff'd o.b., 297 N.J.Super. 309, 688 A.2d 108 (App.Div.1996), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997) *960 (holding that, under the New Jersey Constitution, a condominium association that endorsed candidates must allow access to opposition).
The manner and extent to which functions undertaken by community associations have supplanted the role that only towns or villages once played in our polity mirrors the manner and extent to which regional shopping centers have become the functional equivalents of downtown business districts. "Common interest developments are the fastest growing form of housing in the United States." Mulligan, supra, 337 N.J.Super. at 301, 766 A.2d 1186. "New Jersey is among the states in which residential community associations are most common." Ibid.
It follows that fundamental rights exercises, including free speech, must be protected as fully as they always have been, even where modern societal developments have created new relationships or have changed old ones. See Coalition, supra, 138 N.J. at 368, 650 A.2d 757. Expressive exercises, especially those bearing upon real and legitimate community issues, should not be silenced or subject to undue limitation because of changes in residential arrangements, such as where lifestyle issues are governed or administered by community associations in addition to being regulated by governmental entities. See id. at 370, 650 A.2d 757.
The motion judge in this matter did not consider the impact of the holdings in Schmid and Coalition, except to observe that Twin Rivers was "no more a municipality" than was a university or a mall. He did not adequately address plaintiffs' argument that, even if Twin Rivers is viewed solely as private property, the TRHA can be required to allow free speech and other expressive exercises, as broadly guaranteed in the New Jersey Constitution even as to non-governmental actors, when the public interest weighs more heavily in the balance than the private property rights involved. See Coalition, supra, 138 N.J. at 334, 650 A.2d 757; Schmid, supra, 84 N.J. at 562, 423 A.2d 615.
Defendants rely on Bluvias v. Winfield Mutual Housing Corp., 114 N.J. 589, 590, 556 A.2d 321 (1989), in which the plaintiffs claimed that bylaws of the defendant housing cooperative, which favored existing members and their families, violated the equal protection guarantees of the State and federal constitutions. Holding that the defendant's board, "the claimed state actor," was a separate entity from the town government and the town was therefore not a "company town" under Marsh v. Alabama, supra, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, the Court dismissed the appeal because it presented no constitutional issues.
Here, plaintiffs do not argue that Twin Rivers is a state actor, but assert that it is a "constitutional actor required to respect fundamental rights protected by the New Jersey Constitution when exercising dominion over persons residing within its borders." We recognize the distinction as valid.
Since the decision in Bluviaswhich did not involve fundamental rightsthe New Jersey Supreme Court has held that the State constitutional right to free speech "means communicating with the people in the new commercial and social centers; if the people have left for the shopping centers, our constitutional right includes the right to go there too, to follow them, and to talk to them." Coalition, supra, 138 N.J. at 370, 650 A.2d 757. It is evident that plaintiffs' fundamental rights as established in the New Jersey Constitution, including their free speech rights, *961 must also follow them to their new residences in planned developments.
We have also acknowledged that the constitutional right to free speech could outweigh the property rights of a private condominium association even in the absence of an express or implied invitation to the public or the speaker. In Guttenberg Taxpayers and Rentpayers Ass'n v. Galaxy Towers Condominium Ass'n (Galaxy Towers I), 296 N.J.Super. 101, 104, 686 A.2d 344 (App.Div.1995), the defendant condominium association endorsed several school board candidates by distributing flyers, but denied the request of the plaintiffsan unrelated, "nonprofit ... association involved in political activities in [the community,]" along with one of its trustees and a candidatefor permission to distribute literature endorsing their slate of candidates. Id. at 103, 686 A.2d 344. Without determining that the condominium association was a governmental actor for constitutional purposes, we relied on Schmid and Coalition to reverse the denial of a preliminary injunction that would have allowed plaintiffs to distribute their flyers. We remanded for a plenary hearing on the factual circumstances, stating:
The required balancing of property rights and free speech rights depends on a discreet consideration of the facts concerning the use of the property, as well as the practices of the condominium association with regard to its endorsement of political candidates and issues, and other activities deemed pertinent under the present case law.
[Id. at 108, 686 A.2d 344.]
After the hearing on the remand, in Galaxy Towers II, supra, 297 N.J.Super. at 409, 688 A.2d 156, the trial court found that the condominium was "routinely used for political campaigning," and that plaintiffs had no adequate substitute for door-to-door communication. The court said: "A level playing field requires equal access to this condominium because it has become in essence a political `company town' ... in which political access controlled by the Association is the only `game in town.'" Id. at 411, 688 A.2d 156. We affirmed on the basis of the trial court's opinion. 297 N.J.Super. 309, 688 A.2d 108.
A trial court had reached the same result a quarter century earlier, before Schmid and Coalition, in State v. Kolcz, 114 N.J.Super. 408, 410, 276 A.2d 595 (Cty.Ct.1971). There, the court dismissed complaints for criminal trespass against the defendants who had canvassed door-to-door in a private, planned retirement community, Rossmoor, to solicit signatures on a petition to change the form of municipal government. The court applied decisions relating to municipalities because Rossmoor "is in many essential regards a self-sufficient community." Id. at 415, 276 A.2d 595. In overturning convictions for criminal trespass under the predecessor statute of N.J.S.A. 2C:18-3, the court distinguished regulations of commercial speech from those affecting political speech, stating, after a review of state and federal court decisions dealing with the issue: "It appears that persons endeavoring to disseminate political or religious information are protected by the constitution, but those wishing to canvass an area for business purposes must yield to other considerations." Id. at 415, 276 A.2d 595. The court commented that denying the defendants the right to canvas "would, in effect, create a political `isolation booth.'" Id. at 416, 276 A.2d 595.
Even several years before Kolcz, a trial court, in an opinion with which we expressed agreement, articulated an earlier version of the balancing test that has come to apply in such matters, although affirming a criminal trespass conviction:

*962 This court is aware of the fact that under certain circumstances picketing on private property has been held not to constitute a trespass. Courts of other states have so held with regard to picketing on sidewalks in front of establishments located in a shopping center privately owned. In this regard, the courts have weighed the constitutional rights of free speech of pickets and the constitutional rights of owners of private property. One of the elements considered, however, was the circumstance as to whether the rights of free speech could have been exercised in a manner so that it would not have been rendered ineffective to bring home the message sought to be imparted to the public. In other words, the courts balanced the "equities" as between the parties.
[State v. Kirk, 84 N.J.Super. 151, 157, 201 A.2d 102 (Cty.Ct.1964), aff'd o.b., 88 N.J.Super. 130, 211 A.2d 200 (App.Div. 1965).]
Here, we conclude, for the reasons stated in Galaxy Towers I, Galaxy Towers II, and Kolcz, as well as the policy insight in Kirk, that TRHA's status as a homeowners' association that has not invited the public to the community, should not preclude the application of the balancing test of Schmid and Coalition.
Defendants contend that, in Verna v. Links at Valleybrook Neighborhood Ass'n, 371 N.J.Super. 77, 84, 852 A.2d 202 (App. Div.2004), decided after the trial court ruled in this matter, we held that constitutional analysis does not apply to the governance of a homeowners' association. An examination of our opinion there discloses, however, that we declined to discuss whether parking restrictions met constitutional standards, because the issue was "clearly without merit ..., R. 2:113(e)(1)(E)[.]" Ibid. We did not specify which constitutional standards were implicated or why they were inapplicable; and our decision not to address the application of fundamental expressive exercise rights guarantees to homeowners' associations in the context presented there in no way affects our consideration of the question here.
In short, we reject defendants' strenuously urged argument, propounded in an effort to minimize the impact of Schmid and Coalition, that the holdings in those cases were based on the private property owners' express or implied invitations to the public to enter and use the premises at issue. Even if that factual distinction had any persuasive force, it would furnish no adequate basis for holding that residents of Twin Rivers should be deprived of their fundamental rights guarantees under the State Constitution. The public/private distinction urged is too facile and may be misleading. Any person is free to accept Twin Rivers's invitation to purchase or rent property in that community; that choice cannot be at the expense of relinquishing what the New Jersey Constitution confers. Moreover, even where there has been no invitation to the public, our jurisprudence clearly allows access to private property to exercise constitutionally guaranteed rights. Twin Rivers is in New Jersey. The rights guarantees of our State Constitution apply in that community as in every other in the State.
In State v. Shack, 58 N.J. 297, 302, 277 A.2d 369 (1971), the Supreme Court reversed convictions for trespass against defendants who had entered a private farm to find and assist two migrant workers. The Court held that "ownership of real property does not include the right to bar access to governmental services available to migrant workers." Noting that migrant workers were disadvantaged, isolated and powerless, and that Congress had enacted legislation to assist them, the Court said: *963 "Title to real property cannot include dominion over the destiny of persons the owner permits to come upon the premises. Their well-being must remain the paramount concern of a system of law." Id. at 303, 277 A.2d 369.
In Galaxy Towers I, the absence of "any public invitation to use the property" did not require a judgment in favor of the condominium association. 296 N.J.Super. at 104, 686 A.2d 344. Similarly, in Kolcz, there was no public invitation to use the property.
Notwithstanding these approaches, we have sometimes upheld sanctions or limitations of expressive exercises because we have discerned no adequate basis for viewing private property as devoted to public use. See, e.g., State v. Brown, 212 N.J.Super. 61, 513 A.2d 974 (App.Div.), certif. denied, 107 N.J. 53, 526 A.2d 140 (1986) (trespass convictions for anti-abortion demonstration at a women's health clinic were affirmed, because the property was not sufficiently devoted to public use); Bellemead Dev. Corp. v. Schneider, 196 N.J.Super. 571, 575, 483 A.2d 830 (App. Div.1984), certif. denied, 101 N.J. 210, 501 A.2d 894 (1985) (an injunction barring a union organizer from leafletting at entrances to office buildings was affirmed, because the property was not devoted to public use). We will not consider whether the holdings of these cases can survive the broad policy declarations of Coalition, decided subsequently. Because of essential differences of factual background and public participation, we regard neither the reasoning nor the results in Brown and Bellemead Dev. Corp. to have any bearing upon the issues before us here. Cf. William G. Mulligan Foundation v. Brooks, 312 N.J.Super. 353, 364, 711 A.2d 961 (App.Div.1998)(focusing on plaintiff's lack of standing).
Defendants argue that Galaxy Towers I, Galaxy Towers II, and Kolcz, as well as Shack, involved the rights of non-owners or non-residents to enter the property, whereas here, plaintiffs are residents and property owners in Twin Rivers and members of TRHA. They assert that "no New Jersey court ever has applied the Schmid line of cases ... to questions related to a private entity's dealings with its own members concerning non-public issues."
We reject the notion that a community association's suppression of its own members' campaigns for election to the board of that association or any other expressive exercise relating to life in the community or elsewhere should be regarded as matters of contractual right or business judgment. In the exercise of fundamental rights, we discern no principled basis for distinguishing between the general public at large and the members of a community association. Because of the broadly applicable rights guarantees contained in the New Jersey Constitution, any regulation of a fundamental right engages the public interest by definition, especially where the regulator is functionally equivalent to a governmental body in its impact upon the affected public. Although plaintiffs are not as disadvantaged and isolated as the migrant workers in Shack were, they are powerless, without freedom of expression, to affect the rules that govern them in daily living. The public interest encompasses "an accommodation between the right of the [private property] owner and the right of individuals who are parties with him in consensual transactions relating to the use of the property." Shack, supra, 58 N.J. at 306, 277 A.2d 369. TRHA, as owner of the common property in the community where plaintiffs live, should not be permitted to control their destiny, see id. at 303, 277 A.2d 369, to the extent of depriving them of the right to *964 express their views, especially on matters of public or community concern.
Property rights serve human values. They are recognized to that end, and are limited by it. Title to real property cannot include dominion over the destiny of persons the owner permits to come upon the premises. Their well-being must remain the paramount concern of a system of law. Indeed the needs of the occupants may be so imperative and their strength so weak, that the law will deny the occupants the power to contract away what is deemed essential to their health, welfare, or dignity.
[Ibid.]

D.
Support beyond caselaw exists for our decisional rationale. The Legislature, too, has acknowledged a public interest in planned communities like Twin Rivers.
When the Legislature enacted PREDFDA,[3] it recognized the "increased popularity" of planned developments. The Legislature "deem[ed] it necessary in the interest of the public health, safety and welfare, and in the effort to provide decent, safe and affordable housing, and to foster public understanding and trust, that dispositions in these developments be regulated by the State[.]" N.J.S.A. 45:22A-22.
Under PREDFDA, planned developments must register with the Department of Community Affairs and provide a public offering statement to purchasers. N.J.S.A. 45:22A-26. PREDFDA requires the existence of an association, with an executive board elected by the members and liable to them as fiduciaries, to manage the common elements and facilities. N.J.S.A. 45:22A-44 and -45. The Act does not address the conduct of association elections, but the requirement for elections must be taken to connote fair and open processes, in which opposition candidates are entitled to campaign.
PREDFDA also provides: "The association shall exercise its powers and discharge its functions in a manner that protects and furthers the health, safety and general welfare of the residents of the community." N.J.S.A. 45:22A-44(b). Plaintiffs do not allege a violation by TRHA of that specific provision, but if TRHA has denied a voice to challengers, thereby suppressing opposition and skewing elections, such conduct would be viewed as an improper exercise of legislatively established powers, i.e., against the welfare and best interests of the community's residents. Statutes are the primary manifestations of public policy, and a violation of a statute tends to frustrate the public policy underpinnings of the enactment. See Brandon Farms Prop. Owners Ass'n v. Brandon Farms Condo. Ass'n, 180 N.J. 361, 374-75, 852 A.2d 132 (2004).
Defendants contend that plaintiffs' remedy is to seek to change the restrictions to which they object "by voting in Board elections, running for the TRHA Board or simply lobbying other TRHA members...." However, the essence of plaintiffs' argument is that the objectionable restrictions prevent plaintiffs from effectively pursuing change, even to the extent of denying the opportunity to vote, as they contend occurred in Fritzges's case.
*965 Finally, defendants argue that subjecting homeowners' associations to constitutional standards would result in substantial negative consequences, "alter the very nature of planned developments," "create chaos," erode private property rights, limit the freedom to contract, discourage new development, cause associations to lose their flexibility, and infringe the rights of the majority. The Court in Coalition repudiated similar arguments in rejecting a "list of `horribles' suggested by defendants as the inevitable consequence of our holding for other forms of private property," 138 N.J. at 373, 650 A.2d 757, albeit limiting "the constitutional extension of free speech" to large shopping centers, and excluding smaller centers and other uses. Ibid.
Defendants miss an essential point in invoking the business judgment rule as the only standard available in reviewing a member's challenge to the action of a community association. In a variety of instances, the business judgment rule has been held to be subject to overriding requirements of reasonableness, good faith, and fiduciary responsibility. Determinations regarding the meaning and application of constitutional standards often employ rules of reasonableness, as well. See Siller v. Hartz Mountain Assocs., 93 N.J. 370, 382, 461 A.2d 568, cert. denied, 464 U.S. 961, 104 S.Ct. 395, 78 L.Ed.2d 337 (1983).
The business judgment rule is designed to prevent courts from second-guessing internal business decisions "made in good faith based on reasonable business knowledge." Green Party v. Hartz Mountain Indus., Inc., 164 N.J. 127, 147, 752 A.2d 315 (2000). The business judgment standard has been consistently approved and applied, but not without appropriate attention to its inherent limitations. See, e.g., Thanasoulis v. Winston Towers 200 Ass'n, 110 N.J. 650, 657, 542 A.2d 900 (1988) (condominium association was not authorized to charge higher parking fee for nonresident owners); Verna, supra, 371 N.J.Super. at 93, 852 A.2d 202 (addressing limitations on association's authority to advise members about the "good standing" of board candidates); Owners of the Manor Homes of Whittingham v. Whittingham Homeowners Ass'n, 367 N.J.Super. 314, 322, 842 A.2d 853 (App. Div.2004) (association could change method of calculating maintenance assessments); Walker v. Briarwood Condo Ass'n, 274 N.J.Super. 422, 426, 644 A.2d 634 (App. Div.1994) (association was not authorized to impose fines and file a lien without judicial process).
Requirements of reasonableness, good faith and fair dealing, and fiduciary duty have been expressly held to be among the inherent limitations on the business judgment rule. See, e.g., Green Party, supra, 164 N.J. at 131, 148-49, 752 A.2d 315; Coalition, supra, 138 N.J. at 353, 650 A.2d 757; Siller, supra, 93 N.J. at 382, 461 A.2d 568; Schmid, supra, 84 N.J. at 563, 423 A.2d 615; The Glen, Section I Condo. Ass'n v. June, 344 N.J.Super. 371, 380, 782 A.2d 430 (App.Div.2001); Mulligan, supra, 337 N.J.Super. at 301-03, 766 A.2d 1186; Kim v. Flagship Condo. Owners Ass'n, 327 N.J.Super. 544, 554, 744 A.2d 227 (App. Div.), certif. denied, 164 N.J. 190, 752 A.2d 1292 (2000); Billig v. Buckingham Towers Condo. Ass'n I, 287 N.J.Super. 551, 563-64, 671 A.2d 623 (App.Div.1996); Chin v. Coventry Square Condo. Ass'n, 270 N.J.Super. 323, 328-29, 637 A.2d 197 (App. Div.1994); Papalexiou v. Tower W. Condo., 167 N.J.Super. 516, 527, 401 A.2d 280 (Ch.Div.1979). The Supreme Court has consistently analyzed matters such as this by "balanc[ing] the competing interests, giving proper weight to the constitutional *966 values." Green Party, supra, 164 N.J. at 149, 752 A.2d 315.

IV
In evaluating for summary judgment purposes the validity of three policies adopted and applied by TRHA to plaintiffsthose designated as Resolution 99-1, Resolution 99-4, and Resolution 2000-1 the motion judge saw a need to "address whether TRHA is subject to any part of [PREDFDA]. N.J.S.A. 45:22A-21 et seq." As the motion judge framed the issues presented by the parties, defendants sought summary judgment on the counts involving plaintiffs' challenges to those resolutions on the basis
that the PREDFDA regulations do not apply to Twin Rivers and that the "business judgment" rule should be the standard used to evaluate resolutions duly enacted by the Association Board. Defendants claim that N.J.S.A. 45:22A-42 specifically exempts from the Act any portion of a planned real estate development already holding building permits or municipal approvals issued prior to 1977 when the Act was made effective. Since Twin Rivers was established in 1973, Defendants have argued that Twin Rivers falls within this exception and therefore none of the regulations of the Act apply to its by-laws.
Plaintiffs claim that 1993 amendments to the Planned Real Estate Development Act ("PREDFDA") apply to Twin Rivers. They argue that while developments approved or existing before PREDFDA enactment in 1977 were naturally exempted from regulations involving pre-purchase disclosures and development stages of the communities, this exemption could not logically apply also to the 1993 amendments regarding governance of those communities through their associations. It would not be reasonable, they argue, for the New Jersey Legislature to have protected the rights of residents in newer communities while ignoring the rights of residents in communities planned before 1977. Defendants counter that there is no indication that the Legislature intended the amendments to apply where the original act did not, and the fact that the exemption provisions were not changed during the amendments supports this view.
The judge went on to analyze and resolve these arguments as follows:
PREDFDA resulted from the Legislature's "recognition of the increased popularity of various forms of real estate development in which owners share common facilities, units, parcels, lots, areas or interests." N.J.S.A. 45:22A-22. The amendments to the Act passed in 1993 do not relate to the creation or sale of units within a development. Rather, they address the administration and management of planned real estate developments, and were "intended to prescribe a consistency of management methods in all types of PREDs, and to safeguard the interests of the individual owners or occupants." (Committee Statement to Senate, No. 217, L.1993, c. 30 (1993)).
The bill also incorporates into PRED law certain provisions-relating to the bylaws of unit owners' associations, the establishment of members' voting rights, the allocation and collection of common expenses, the amendment of association by-laws and the adoption, amendment and enforcement of rules concerning the common elementsthat are now found only in the statute on condominiums. [Id.]
Although the court will first look to the plain language of the statute in its judicial construction, N.J.S.A. 1:1-1, it cannot ignore the intent of the Legislature *967 by imposing a rule of strict construction that would defeat the apparent legislative design. Board of Ed. of Manchester Twp., Ocean County v. Raubinger, 78 N.J.Super. 90, 97, 187 A.2d 614 (App.Div.1963). Here it seems that the Legislature did not contemplate that the law would not extend to all PREDs, since the clear intent was to provide consistency of management and to safeguard the interests of owners. Where the drafters of a statute did not consider a specific situation, a court should interpret the enactment "consonant with the probable intent of the draftsman `had he anticipated the situation at hand.'" Matlack v. Burlington Cty. Bd. of Chosen Freeholders, 194 N.J.Super. 359, 361, 476 A.2d 1262 (App. Div.1984), certif. denied, 99 N.J. 191, 491 A.2d 693 (1984) (citations omitted). A literal interpretation of a statute will not be applied where to do so would distort the clearly expressed legislative intent. State v. Schumm, 146 N.J.Super. 30, 33, 368 A.2d 956 (App.Div.1977), aff'd 75 N.J. 199, 381 A.2d 33 (1978).
It is reasonable to read N.J.S.A. 45:22A-21 through 45:22A-41 as inapplicable to portions of communities where building permits were obtained and plans were already completed, since it would have required amendment of permits already in place, and would have subjected developers to fines for sales which had already taken place.* There is no similar logic for extending the exemptions to those sections of the Act that were added in 1993. The Legislature clearly intended for any association not in compliance with the regulations prior to the effective date to make "proper amendment or supplementation of its by-laws," and failure or refusal to do so does not "affect their obligation of compliance therewith on and after that effective date." N.J.S.A. 45:22A-48.
It would be unreasonable to assume that the protections granted to all New Jersey condominium residents and residents of those portions of PREDs constructed after 1977 were not intended to apply to residents of portions of PREDs constructed prior to 1977. Such a literal reading of the Act could result in residents of older homes being given fewer rights regarding community maintenance and administration than their neighbors who may happen to live in a newer home. This court is not willing to find that this is what the Legislature intended when enacting the amendments to PREDFDA. Therefore, the court finds that the 1993 amendments to PREDFDA, codified at N.J.S.A. 45:22A-43 through 48, apply to Twin Rivers; and any portion of the Association by-laws and resolutions not in compliance are in violation of the statute.
* The court notes that, under the terms of N.J.S.A. 45:22A-37(e), individual owners were not permitted to waive compliance with the PREDFDA requirements.
We are in substantial agreement with the motion judge's rationale and conclusion in this regard.

V
Finally, on the last of the "overarching issues" before the court on the parties' cross-motions for summary judgment, the motion judge considered defendants' challenge to CBTR's standing as a plaintiff. As the judge noted in his opinion, outlining the positions of the parties on this issue:
Defendants ... claim[ed] that at no time since the filing of the suit have there been seven members of the organization as required by N.J.S.A. 2A:64-1, which provides in pertinent part:

*968 Any unincorporated organization or association, consisting of 7 or more persons and having a recognized name, may sue or be sued in any court of the state by such name in any civil action affecting its common property, rights and liabilities....
"Common rights and liabilities" means rights and liabilities that members share or incur similarly, that is, those pertaining with like application and relevancy to the members of the group. New Jersey Bankers Ass'n v. Van Riper, 142 N.J. Eq. 301, 60 A.2d 98 (Ch.Div.1948), rev'd on other grounds, 1 N.J. 193, 62 A.2d 677 (1948).
Plaintiffs claim that CBTR has no formal membership, and consists of more than seven supporters. CBTR, they claim, has standing to sue in this case because it represents a "mini class" of interested parties who seek the same constitutional result as the individual Plaintiffs. Plaintiffs argue that the court should apply a liberal approach to standing because the case involves "public interest" or "group litigation."
Defendants argue that CBTR represents only the private interests of Twin Rivers homeowners, and its membership consisted of only six people when the suit was brought, and that it is neither a public interest group nor is it group litigation. Although Twin Rivers is organized as a non-profit organization, Defendants contend that it is not a charitable corporation or an association dedicated to the public interest such that the threshold for standing in cases against it would be very low. See City of Paterson v. Paterson Gen. Hosp., 97 N.J.Super. 514, 527-28, 235 A.2d 487 (Ch.Div.1967). Therefore, Defendants conclude that there is no public policy reason for the court to extend standing to CBTR where it does not meet the statutory requirements for standing.
Plaintiffs claim that the language of the statute implies that the requirement that an association consist of seven persons does not require seven members.
In deciding the issues:
The court decline[d] to adopt this reading of the statute. The statute makes clear that the rights and remedies of the association are the same "as if the action were prosecuted by or against all the members thereof." N.J.S.A. 2A:64-1. The law further specifies that "an action shall not abate ... by reason of any change in membership." Id. The court is unable to determine what rights and remedies the association may be entitled to or may be at stake without knowing what the rights of its members are. It would similarly be impossible for a court to impose liability against an unincorporated association without any way to determine the identity of its members.
In order to possess standing, the plaintiff must have a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and there must be a substantial likelihood that the plaintiff will suffer harm in the event of an unfavorable decision. New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 67, 411 A.2d 168 (1980); Crescent Pk. Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107, 275 A.2d 433 (1971); In re Twp. of Howell, 254 N.J.Super. 411, 416, 603 A.2d 959 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991). The court can determine none of this if CBTR has no formal membership and consists only of unnamed individuals who "share in its goals and participate in its activities."

*969 CBTR did not have seven or more members when it joined as Plaintiff in this litigation, and is now comprised of only three members. The original six members were not without remedy, but were not entitled to standing as an organization. The attrition in CBTR's membership since the filing of the suit is immaterial to the issue of standing, since a change in the membership after the filing of suit does not affect standing at the time the suit was brought, but it highlights the reasoning behind the Legislature's imposition of a seven-member threshold. "[T]he essential purposes of the standing doctrine in New Jersey ... are to assure that the invocation and exercise of judicial power in a given case are appropriate ... to generate confidence in the ability of the judicial process to get to the truth of the matter and in the integrity and soundness of the final adjudication ... [and] to fulfill the paramount judicial responsibility of a court to seek just and expeditious determinations on the ultimate merits of deserving controversies." New Jersey Citizen Action v. Riviera Motel Corp., 296 N.J.Super. 402, 410, 686 A.2d 1265 (App.Div.1997), appeal dismissed, 152 N.J. 361, 704 A.2d 1297 (1998). Adjudication of the rights of large groups of individuals through an association is an appropriate invocation of judicial power and serves the goal of expediency. Adjudication of the rights of three individuals through an association adds nothing to the expediency or integrity of the proceedings. Where the issue of standing is at least debatable, the action will be permitted to proceed if the resolution of the issues is in the public interest. Booth v. Township of Winslow, 193 N.J.Super. 637, 640, 475 A.2d 644 (App. Div.1984), certif. denied, 97 N.J. 657, 483 A.2d 179 (1984), cert. denied, 469 U.S. 1107, 105 S.Ct. 781, 83 L.Ed.2d 776 (1985). Because there is no public interest at stake, but only the private rights of individuals within a contractual relationship, and because the interests of the members are still represented as individuals, the court will not extend standing to an unqualified organization. The rights of these three individuals are better adjudicated as individual co-plaintiffs. Therefore the court holds that Plaintiff CBTR does not have standing to appear as a party to this suit.
We not only reject the motion judge's reliance upon the idea that this case involves no "public interest ... but only the private rights of individuals within a contractual relationship," but we also hold that the question of CBTR's standing could not appropriately be decided on summary judgment because the number of persons who were members of CBTR at critical times was a fact in dispute. We leave it to the trial court and the parties to determine on remand whether it is necessary to decide any questions raised by CBTR in the circumstances, since it appears that all issues raised on CBTR's behalf could validly be raised by one or more of the individual plaintiffs.

VI
Having determined that the motion judge erred in his view of one of the basic decisional standards applied in resolving some of the specific challenges raised in the complaint adversely to plaintiffs, it is fitting that we remand on those issues to afford the trial court an opportunity to apply summary judgment standards in the light of our holding that defendants' actions are subject to constitutional norms when they impinge on plaintiffs' fundamental rights to engage in expressive exercises, and are not insulated from such scrutiny by the business judgment rule or any other like criterion stemming from *970 contractual relationships. It remains to be determined, in the light of the proper standard, whether plaintiffs' claims are adequately based on their expressive rights interests, unaffected by legitimate countervailing interests, to qualify them for the relief they seek in each of the surviving counts of the complaint, i.e., those disposed of in the trial court's grant of summary judgment to defendants on counts one, two, and three, five, eight, and nine or aspects thereof.

A.
We have been given no persuasive reason in the context of defendants' cross-appeal to overrule any of the determinations the motion judge made favorably to plaintiffs on their motion for summary judgment. We agree substantially with the motion judge's reasoning that the challenged TRHA provisions he ruled to be invalid could not survive examination and evaluation under the "business judgment" or contractual basis approach he employed. In the context of our decision that a more demanding standard applies in determining the validity of some of the TRHA practices and procedures challenged in the complaint so as to entitle plaintiffs to reassessment of their claims by that higher standard, defendants are not entitled to reexamination of the rulings made in plaintiffs' favor by applying less demanding criteria.
To the extent the motion judge erred in respect of Resolution 2002-8, challenged in count two of the complaint, by basing his decision on an incorrect sense that the community room was open to public use, his primary rationale was unaffected by that misunderstanding. The judge's main ground of decision, that Resolution 2002-8 could not survive examination under the business judgment rule because it was vague and unreasonable, see, e.g., Papalexiou, supra, 167 N.J.Super. at 527, 401 A.2d 280, is a valid discretionary evaluation well grounded in the record, with which we substantially agree. Thus any misunderstanding the judge may have had regarding public use of the room would qualify as harmless error.
We affirm, as correct and well-based, the determinations that Resolution 2000-1 was disallowed under PREDFDA and was, in any case, unacceptable under the business judgment rule because it was fatally vague on its face and had been arbitrarily applied. Summary judgment on count six of the complaint was, accordingly, properly granted to plaintiffs.
Finally in this regard, we substantially agree with the motion judge's ruling in respect of count seven, invalidating the $1000 "liquidated damages" clause in the confidentiality agreement that members must sign in order to obtain the list of TRHA members. The judge discerned substantial merit in plaintiffs' position that the liquidated damages clause was a penalty that "serves to deny them access to the list." He found no "sufficient justification... as to how the $1000 sum reasonably relates to the harm alleged." The judge further determined that the penalty was a patently unfair contract of adhesion, which no reasonable person would voluntarily accept. He commented: "The problem at the heart of this case is that neither party has any confidence in the other to act in good faith." The ruling in favor of plaintiffs on the liquidated damages clause was based on a well-considered determination that the clause at issue was unreasonable in the circumstances, see MetLife Capital Fin. v. Washington Ave. Assocs., 159 N.J. 484, 495, 732 A.2d 493 (1999), giving full consideration to "the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties[.]" Ibid. See also *971 Naporano Assocs. v. B & P Builders, 309 N.J.Super. 166, 176, 706 A.2d 1123 (App. Div.1998). We have been given no persuasive reason to reverse the judge's determination in this regard, either.

B.
As we have stated, in reaching our conclusions, we do not rule upon the merits of any of the claims plaintiffs have made bearing upon their fundamental rights under the New Jersey Constitution; only that, in resolving those claims on summary judgment, the trial court applied an inappropriate standard. Accordingly, we remand for reconsideration by the proper standard of the claims based upon the expressive rights guarantees of article I, ¶¶ 6 and 18. We recognize that such rights, while fundamental, are not absolute. They are subject to reasonable and proper limitations having to do with the time, place and manner of their exercise. See, e.g., Coalition, supra, 138 N.J. at 377-78, 650 A.2d 757; Schmid, supra, 84 N.J. at 563-64, 423 A.2d 615. We leave to the trial court the assessment of any questions that remain in this regard.
Our sense of things is that, of the rulings adverse to plaintiffs, only those involving counts one, two, and three of the complaint implicate fundamental rights interests, i.e. the expressive exercises involved in sign-posting, the use of meeting space, and access to a print medium. Therefore, only those issues must be reconsidered. The adverse rulings on counts five, eight, and nine, bearing, as they did, on access to records, modes of dispute resolution, and association voting criteria, were based on reasonable and substantially correct interpretations of statutory standards, applications of the business judgment rule, and assessments of the parties' contractual rights and interests.

1.
Plaintiffs' claim for access to financial documents, contained in count five of the amended complaint, focused on Resolution 99-1, which, according to plaintiffs, "requires that all confidential document requests are to be granted upon the approval by a majority of the Board." The complaint alleged that the Board "is abusing its discretion when deciding whether to allow access to confidential documents," specifically with regard to an October 3, 2000 request by plaintiff Bar-Akiva. The complaint referred to the Board's "blanket statement that [Bar-Akiva's] requests were deemed to be an invasion of privacy of residents and employees, without further specification as to how any of the requested documents invaded anyone's privacy." The complaint invoked both the general corporations statute and the Nonprofit Corporation Act as "provid[ing for]... access by members to corporation books and records[,]" and asserted that TRHA is bound by those provisions. Plaintiffs sought injunctive relief "disallowing the TRHA Board from denying access to financial documents without specification of the reasons for concealment."
Resolution 99-1 had been adopted in response to a trial court ruling in a prior case that required modification of a predecessor provision. The motion judge in the instant matter determined that Resolution 99-1 was "not impermissibly vague or arbitrary," and that it properly reposed in the Board the discretion to evaluate requests for the production of documents. Therefore, the judge concluded, the resolution was not facially invalid.
The judge held that the business judgment rule applied, and that the scope of Bar-Akiva's request for "`all association documents' for a 5-year period," even as subsequently modified, was unreasonable and burdensome. The judge opined that *972 the purpose of the request, "to verify the statements of the Association President, does not seem like a `proper purpose' for requesting such a vast quantity of documents, but this was a matter for the Association Board to decide." He held:
It is not only to Bar-Akiva that the Board owes a fiduciary duty. It must also determine the best use of the Association's resources for all of its members. It was the Board's determination that the expense and time of collecting and redacting the thousands of documents requested by Bar-Akiva would impose too great a burden on the Association.
Resolution 99-1 provides a standard of good cause based upon specific considerations that were made by the Board. In denying Bar-Akiva's request, it does not appear that the Board abused its discretion by acting other than in good faith, from proper motives, and within the bounds of reasonable judgment. Judge v. Kortenhaus, 79 N.J.Super. 574, 192 A.2d 320 (Ch.Div. 1963). Therefore this court will not interfere in their exercise of their discretionary powers. Because the Resolution is neither improperly applied nor invalid on its face, the court will grant summary judgment to Defendants on Count Five of the complaint.
We are in substantial agreement with the motion judge's disposition of this issue.

2.
The trial court also granted summary judgment to defendants on plaintiffs' challenge in count eight to Resolution 99-4 on the basis that it "provides for an inadequate and ineffective system of dispute resolution."
The judge began his resolution of this issue by describing the alternative dispute resolution (ADR) policy at issue:
The rule provides for ADR for disputes between unit owners or disputes between individual owners and the Association. The policy requires that the party requesting ADR submit a $150 deposit along with the application for ADR, but the costs of ADR are to be split equally between the parties. The rule specifically exempts three types of disputes from ADR eligibility: (1) the payment or nonpayment of regular and/or special common expense assessments levied against a unit in accordance with the governing documents; (2) election issues; and (3) alleged noncompliance by the Association or the Board with the governing documents or applicable law.
He summarized plaintiffs' positions, noting that:
Plaintiff Bruce Fritzges ("Fritzges") objected to an assessment of $3.00 per month for cable fees that was duly assessed on all owners. Under the current policy, Fritzges cannot apply for ADR to challenge this assessment.
and that:
Plaintiffs seek to have Resolution 99-4 regarding alternative dispute resolution ("ADR") declared unlawful and unenforceable because the high cost and limited availability do not allow for the "fair and efficient" procedure that PREDFDA requires. This is important, Plaintiffs claim, because members are denied voting rights for even the smallest disputed assessment or fine. Without affordable and accessible ADR, Plaintiffs argue, members face a choice of paying a disputed assessment, paying expensive fees to settle the limited disputes covered under the current ADR policy, or relinquishing their voting rights in the Association.
*973 The judge then outlined defendants' positions:
Defendants deny that the Association's ADR provisions in Resolution 99-4 must comply with PREDFDA guidelines, since they maintain that PREDFDA is inapplicable to Twin Rivers. TRHA claims that it would be paralyzed by constant claims were it to provide ADR for any disagreement with its decisions and assessments. Defendants point to the ADR provisions of the New Jersey Condominium Act, N.J.S.A. 46:8B-14(k), limiting application for "housing-related disputes," to defend TRHA's exemption of certain types of disputes from its own ADR policy. Defendants assert that it is well within their rights under the Nonprofit Corporations Act to suspend the voting rights of any member in default in the payment of any assessment levied by the Association. Under the business judgment rule, Defendants claim that they are entitled to summary judgment on Count Eight.
The judge expressed the following rationale in deciding the issue:
Having found that the requirements of N.J.S.A. 45:22A-44 are applicable to TRHA, the provisions mandating ADR in N.J.S.A. 45:22A-44(c) are also applicable. However, Plaintiffs misread the scope of the statutory provision when they imply that ADR must be made available for every dispute between a member and the Association. The statute specifies: "The association shall provide a fair and efficient procedure for the resolution of disputes between individual unit owners and the association... which shall be readily available as an alternative to litigation." N.J.S.A. 45:22A-44(c)(emphasis added).
In order to evaluate whether TRHA's provisions for ADR meet the requirements of N.J.S.A. 45:22A-44(c), the court must first consider the plain meaning of the statute. National Waste Recycling, Inc. v. Middlesex County Improvement Auth., 150 N.J. 209, 223, 695 A.2d 1381 (1997). Language in the statute should be "given its ordinary meaning and construed in a common sense manner to accomplish the legislative purpose." N.E.R.I. Corp. v. New Jersey Hwy. Auth., 147 N.J. 223, 236, 686 A.2d 328 (1996)(quoting State v. Pescatore, 213 N.J.Super. 22, 28, 516 A.2d 261 (App.Div.1986), aff'd, 105 N.J. 441, 522 A.2d 440 (1987)). Particular words and phrases found in the statute "must be construed within their context and unless inconsistent with the Legislature's manifest intent or unless another meaning is expressly indicated, they must be given their generally accepted meaning." Stevenson v. Keene Corp., 254 N.J.Super. 310, 317, 603 A.2d 521 (App.Div. 1992), aff'd, 131 N.J. 393, 620 A.2d 1047 (1993). The meaning of words within a statute may be indicated or controlled by those with which they are associated. State v. Mortimer, 135 N.J. 517, 536, 641 A.2d 257 (1994), cert. denied, 513 U.S. 970, 115 S.Ct. 440, 130 L.Ed.2d 351 (1994); Germann v. Matriss, 55 N.J. 193, 220, 260 A.2d 825 (1970).
A plain reading of N.J.S.A. 45:22A-44(c) indicates that the requirements for ADR are meant to apply to justiciable cases and controversies between the association and individual members. This interpretation is reinforced by the public policy favoring ADR, which is to relieve the burden on the courts. Cf. Faherty v. Faherty, 97 N.J. 99, 105, 477 A.2d 1257 (1984)("In this state, as in most American jurisdictions, arbitration is a favored remedy."); Barcon Assoc. v. Tri-County Asphalt Corp., 86 N.J. 179, 186, 430 A.2d 214 (1981)(stating that arbitration is favored by the courts in this *974 State). It is not to provide a forum for every disagreement between members and their association, nor to insulate associations from accountability. The requirement that ADR be "readily available" cannot be read outside the context of the phrase that immediately follows, "as an alternative to litigation." It would require a contorted reading of the language and the legislative intent of the statute for the court to hold that the ADR requirement was meant to apply to any dispute between an individual member and an association.
Whether a complaint is justiciable will depend in large part on the form of the association. By law, the association can be formed as a for-profit or non-profit corporation, unincorporated association, or any other form permitted by law. N.J.S.A. 45:22A-43. TRHA is a non-profit corporation, and claims by members against it are regulated by the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 et seq. Members can bring suit against a non-profit corporation either as individuals or as a derivative claim on behalf of the corporation. R. 4:32-5. Individual claims must assert that the acts of the corporation impose a special harm to them as individuals. Derivative claims are brought on behalf of the corporation for ultra vires acts or acts that are fraudulent, self-dealing or unconscionable in which the harm is to the corporation and not to a particular member or class of members. Because derivative claims are not disputes between individual members and the association, but are brought to assert rights on behalf of the corporation, they do not fall under the regulation of N.J.S.A. 45:22A-44(c).
Plaintiffs complain that certain disputes are improperly excluded from the ADR policy. Disputes that do not qualify for ADR under Resolution 99-4 include 1) the payment or non-payment of assessments levied in accordance with the Governing Documents, 2) election issues and 3) alleged noncompliance by the Association or the Board with the Governing Documents or applicable law. Individual unit owners cannot, under New Jersey law dispute duly enacted assessments or fines or, as in the case with Fritzges, exempt himself from a common expense, so these claims are properly excluded.
A unit owner shall, by acceptance of title, be conclusively presumed to have agreed to pay his proportionate share of common expenses.... No unit owner may exempt himself from liability for his share of common expenses by waiver of the enjoyment of the right to use any of the common elements.... N.J.S.A. 46:8B-17.
With the exception of a denial of individual voting rights, election issues are derivative claims. Election irregularities do not cause special harm to an individual, but rather cause harm to the entire corporation. But because voting rights are only limited due to non-payment of assessment, which are not justiciable, disputes concerning individual voting rights are also not justiciable. Therefore, election issues are properly excluded from ADR.* A claim of ultra vires acts, noncompliance with the governing documents, or noncompliance with applicable law constitutes the quintessential derivative claim, and is also properly excluded from ADR. Because it does not withhold ADR from any claims that might be legitimately justiciable, the court cannot find TRHA's ADR policy embodied in Resolution 99-4 to be in violation of the requirements of N.J.S.A. 45:22A-44(c).
The court is also unwilling to hold that a $150 deposit** to be submitted by a *975 petitioner requesting ADR under the policy unreasonably denies access to ADR, especially in light of the comparative cost of litigation. ADR is to resolve disputes that would otherwise be litigated, but it does not preclude litigation and the Association cannot mandate that an individual unit owner submit their dispute to ADR. It is offered to provide a quicker and perhaps more efficient method of resolution of issues that would otherwise be subjected to lengthy and potentially expensive court proceedings. If an individual unit owner is not able to afford the $150 deposit, there is no bar to the filing of a complaint with the court to seek their remedies and to present themselves pro se or seek less costly counsel. [See] R. 4:4-2. Therefore, the court grants summary judgment for Defendants on count eight.
* The court notes that this provision currently withstands review because there are no other situations, other than non-payment of valid assessments or fines, which would result in suspension of a member's voting rights. Should TRHA withhold voting rights for any other reason, the blanket exemption of voting issues from the ADR policy would have to be changed in order for it to remain in compliance with the requirements of N.J.S.A. 45:22A-44(c).
** Under the terms of Resolution 99-4 the party requesting ADR is required to submit a $150 deposit along with the application for ADR, but the costs of ADR are to be split equally between the parties.
We agree with the essence of the motion judge's rationale and with his disposition on the ADR issue.

3.
Finally, the court addressed plaintiffs' challenge, in count nine of the complaint, to the weighted voting provisions of TRHA's bylaws. The trial court summarized the issues and the parties' positions as follows:
For all voting purposes of the Association, each member receives one vote, which is weighted according to the value of the member's holdings in Twin Rivers. Residency is not a factor, so non-owner tenants have no vote while non-resident owners have, in some cases, considerable influence by virtue of the value of their property. Members who have unpaid fines for rule violations or who are not current with payment of their assessments are not eligible to vote in Association elections. The Trust Administrator maintains the list of eligible voters.
Plaintiffs object to the weighted voting system, claiming that the present system disenfranchises a large percentage of community residents, the tenants in the apartment buildings, and unfairly accords more weight to the votes of owners of expensive properties and less weight to owners of less expensive properties. This, say Plaintiffs, is incongruent with the goals of the Associationwhich is to administer the common elements of the community to the benefit of all the residents, since the administration of common areas such as pools and parking lots has a much greater impact on the lives of the tenants than it does on the lives of absentee owners, and has an equal impact on resident homeowners regardless of the value of their individual properties. As a result, Plaintiffs contend that the weighted voting system does not represent the interests of the residents, and does not rationally represent the interests of the owners. Because of the municipal character of Twin Rivers and the powers of the TRHA, Plaintiffs argue that voting rights within the Association are as important to its residents as voting rights *976 in any public elections. Where the property rights of owners conflict with others' fundamental rights, such as free speech, association or voting, Plaintiffs claim that the State's interest in the individual liberty of its citizens should prevail. Even in cases where TRHA is acting less like a municipality and more like a non-profit corporation, since their primary purpose is not to yield a profit for its members, Plaintiffs argue that power is still more appropriately shared between members on an equal basis rather than their degree of investment. Therefore, Plaintiffs claim that a system that allocates votes by residential unit is more appropriate, and is also authorized by the New Jersey Legislature. Plaintiffs assert that disfranchisement for failure to pay minor assessments is not a reasonable policy for the Association, and that Defendants' arguments invoking corporation law regarding their weighted voting policies are inapplicable because they do not address Plaintiffs' claims that constitutional provisions regarding voting should be expanded to include novel forms of governance such as homeowner's associations.
TRHA defends its voting system against Plaintiffs' claim that weighted voting according to the value of each owner's property is unconstitutional. Defendants assert that TRHA's weighted voting system is permitted under the New Jersey Nonprofit Corporations Act. N.J.S.A. 15A:5-10, 20. Defendants argue that this voting system is set forth in the Governing Documents of the Association, including the Association By-laws, Articles of Incorporation and Declaration of Restrictions. Defendants claim that Plaintiffs' own arguments are inconsistent, invoking constitutional requirements of "one person, one vote" to challenge the current voting system, but then asking for a "one unit, one vote" system not supported by the Constitution.
The motion judge then went on to analyze the issues:
Plaintiffs have argued that the court should apply the reasoning of Coalition and Green Party, which extended the constitutional right of free expression to private property, to extend the constitutional right of "one person, one vote" to a homeowner's association. Unlike both Coalition and Green Party, which dealt with a private property owner's rights versus the public, this case concerns an incorporated non-profit association and its members. Unlike the relationship of mall owners to the public, the voting rights of members of an association such as TRHA are governed by contract law and by the relevant statutes for non-profit associations.
Plaintiffs cite two New York cases where the voting rights of homeowner association members have been challenged in court. The holdings in both Roxrun Estates v. Roxbury Run Vill. Ass'n, 136 A.D.2d 162, 526 N.Y.S.2d 633 (App.Div.), appeal denied, 72 N.Y.2d 808, 533 N.Y.S.2d 57, 529 N.E.2d 425 (1988); and Delafield Estates Homeowners' Ass'n v. Delafield 246 Corp., 280 A.D.2d 437, 721 N.Y.S.2d 621 (App.Div. 2001), however, both rely on a specific provision of New York's Non-Profit law which states: "In any case in which a member is entitled to vote, he shall have no more than, nor less than, one vote..." N.Y. Not-for-Profit Corp. Law § 611(c) (2005)(footnote deleted). The comparable provision in New Jersey Nonprofit law reads:
The right of the members or any class or classes of members to vote may be limited, enlarged or denied to the extent specified in the certificate of incorporation or bylaws. Unless so limited, enlarged or denied, each *977 member, regardless of class, shall be entitled to one vote on each matter submitted to a vote of members. N.J.S.A. 15A:5-10.
Defendants argue that PREDFDA specifies that election of board members should be done on a one vote per unit basis, unless the bylaws provide for some other voting system. N.J.S.A. 45:22A-47(b). To hold that anything but a one-person vote system is unconstitutional would require this court to also find that N.J.S.A. 45:22A-47(b) is unconstitutional.
The court is also persuaded by New Jersey's application of contract law to voting rights of stockholders. According to New Jersey law, the certificate of incorporation, constitution and by-laws of a corporation constitute a contract between the corporation and its stockholders. Faunce v. Boost Co., 15 N.J.Super. 534, 83 A.2d 649 (Ch.Div. 1951). A stockholder owning voting stock has a basic contractual right to vote incident to membership or to the property in the stock, of which the stockholder cannot [] be deprived without his consent. Id. at 539, 83 A.2d 649. This does not limit an Association's right to withhold voting rights for non-payment of fees and assessments. N.J.S.A. 15A:5-10 entitles Defendants to withhold voting rights from members that have not paid fines or assessments, provided that these limitations to voting rights are set forth in the governing documents of the Association. The owner's agreement to be bound by the governing documents constitutes his consent to the voting conditions they contain.
It is true that many Twin Rivers residents live in apartments as tenants, and have no voting rights in Association governance. Tenants who are not property owners are not members of the Association and therefore have no voting rights and no standing to bring suit against the Association for denial of franchise. While tenants of Twin Rivers properties may wish for more influence over the way their community is run, the fact that their landlords provide them with the benefits of the Association does not entitle them to a voice in the affairs of the Association. Twin Rivers' tenants are entitled to no more control over their community than are the thousands of other tenants of property in New Jersey. Like other tenants, Twin Rivers tenants "vote with their feet" by choosing to lease the properties.
New Jersey courts have been cognizant of tight housing markets when shaping a remedy for injured tenants. See Marini v. Ireland, 56 N.J. 130, 146, 265 A.2d 526 (1970)(recognizing the impact of housing shortage in allowing tenant to abate conditions rather than claim constructive eviction). But a court cannot craft a more favorable contract than the one the parties themselves have entered into, to grant tenants rights they are not otherwise entitled to and are not included in their lease. See Bar on the Pier, Inc. v. Bassinder, 358 N.J.Super. 473, 489, 818 A.2d 424 (App.Div.), certif. denied, 177 N.J. 222, 827 A.2d 289 (2003). Plaintiffs have implied that a tight housing market leaves residents no choice but to accept rental or purchase agreements that would otherwise be repugnant to them. But denial of association voting rights is not an unconscionable lease provision that would allow this court to void the lease. Absent some legitimate grounds for rescission, the parties must live with the rental agreements they have signed.
Plaintiffs' final argument, that the weighted voting scheme is not a legitimate tool for enhancing property values *978 and is misplaced as a form of community governance, is only subject to review under the business judgment rule. Plaintiffs are simply questioning the governing rules enacted by the Board. Where the Board is authorized to make a decision, the business judgment rule bars judicial inquiry into the decisions of the board of directors made in good faith. See Maul v. Kirkman, 270 N.J.Super. 596, 614, 637 A.2d 928 (App. Div.1994). The Board is authorized under N.J.S.A. 15A:3-1(a)(11) to make and alter the bylaws for the administration and regulation of the affairs of the corporation. Plaintiffs do not claim that TRHA's voting provisions were instituted through fraud, self-dealing or in bad faith. Therefore, the court will grant summary judgment for Defendants on count nine.
We are, in this respect as well, in substantial agreement with the trial court's reasoning and disposition. The arguments advanced by plaintiffs import to elections in community associations the standards heretofore applied only in public sector elections. Without a basis in legislation, it is beyond our authority to effect such a change in the relationships between community associations and their members.

VII
We affirm, in every particular, the grant of summary judgment in favor of plaintiffs. We affirm the grant of summary judgment to defendants on counts five, eight, and nine. We also affirm the general ruling that determined PREDFDA was applicable to the matter at hand, and we vacate the trial court's order dismissing the complaint as to CBTR for want of standing.
We reverse the general ruling in respect of the fundamental rights exercises implicated that TRHA was not subject to limitations imposed by the New Jersey Constitution and that the business judgment rule and contractual standards applied. We remand plaintiffs' claims in counts one, two, and three of the complaint for reconsideration under the proper standard.
NOTES
[1] With the consent of the parties, Judge Lefelt has joined in this decision based on his review of the record and the briefs without having participated in oral argument.
[2] Count four of the complaint was dismissed in an early case management order following agreement that TRHA's current practices permitted tape recording of open board meetings. Plaintiffs do not appeal from the count seven rulings favorable to defendants.
[3] PREDFDA was originally enacted by L. 1977, c. 419, after Twin Rivers was developed; and it was amended by L. 1993, c. 30. As we hold below, the motion judge was eminently correct in determining that PREDFDA in its current form applies to Twin Rivers. Even if we were to reject that conclusion, the Act as amended could nevertheless be regarded as instructive and used for guidance. See Mulligan, supra, 337 N.J.Super. at 301, 766 A.2d 1186.